UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------X
                                        :
CYRIL SMITH,                            :      10 Civ. 8107 (DLC)
                        Petitioner,     :      05 Cr. 922 (DLC)
                                        :
            -v-                         :      OPINION & ORDER
                                        :
UNITED STATES OF AMERICA,               :
                                        :
                        Respondent.     :
                                        :
----------------------------------------X

APPEARANCES:

For the petitioner:
Cyril Smith, appearing pro se
58187-054
U.S.P. Lee
PO Box 305
Jonesville, VA 42263

For the respondent:
David Matthew Rody
U.S. Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, NY 10007


DENISE COTE, District Judge:

    On October 26, 2010, Cyril Smith filed a timely petition

for a writ of habeas corpus pursuant to 28 U.S.C. § 2255.  Smith

was convicted following a jury trial and sentenced principally

to life imprisonment on December 14, 2007.  For the following

reasons, the petition is denied.

                           1

BACKGROUND

A superseding indictment, filed on August 23, 2006, charged Smith in nine counts with narcotics trafficking and committing three separate drug-related contract murders in the Bronx. Following a two-week trial, the jury acquitted Smith on May 30, 2007 on Count Four, which charged Smith with intentionally killing Jamal Kitt ("Kitt") while engaged in a drug trafficking crime.  It convicted Smith on every other count.

The evidence at trial established that Smith was both a narcotics dealer and a "hit man" who murdered three Bronx drug dealers to assist their rivals in the drug business.  Edgardo Colon ("Colon") solicited Smith to murder Kitt and Terrence Celestine ("Celestine").  Smith killed Kitt and Celestine three weeks apart in July 1998.  Less than two years later, Smith killed Sanford Malone ("Malone") to aid Edwin Avilez ("Avilez") and his drug operation.

In broad strokes, Smith's decision to assist Colon by killing Kitt and Celestine unfolded as follows.  In 1998, Smith was selling drugs, primarily outside of New York City.  During the spring, Smith asked his friend Rafael Ramos ("Ramos") to inquire if Colon would supply Smith with drugs.  Colon, who was Hispanic, refused because Smith was black.  During the summer,

2

however, Ramos and Smith learned that Colon wanted Kitt killed because he was infringing on Colon's drug spot.  Smith and Ramos agreed to do it and located Kitt sitting near a woman and her young son on Chisholm Street.  Smith and Ramos walked down the street toward Kitt, and when Ramos hesitated, Smith took the gun from Ramos and shot Kitt three times.  As soon as the shooting started, the woman covered her son with her body.  After the shooting ended, Smith gave the gun back to Ramos.  When Ramos saw the woman looking at him, he "waved her off" with the gun and she and her son retreated into a building.  The woman later identified the shooter as the "Spanish" guy and not his black companion.  Ramos told Colon that Smith had shot Kitt and that Colon should give Smith drugs, but Colon did not do so at that time.

About a month later, Colon remarked to Ramos and Smith that Celestine, a crack dealer, had to go.  When Smith said he would take care of it, Ramos protested that Colon had not paid Smith for killing Kitt.  Colon assured Ramos that this time he would give Smith money and drugs.  Smith then killed Celestine with the same gun he had used to kill Kitt.  Colon gave Smith drugs as payment for the murder.  After Smith sold the drugs out of town, he sent $1,000 to Ramos.

The third murder victim was Malone, whom Smith killed in February 2000.  Malone was the leader of a drug organization known as the Hughes Boys.  Rival drug dealer Avilez feared Malone and believed that Malone would eventually kill him. Avilez decided to kill Malone first and through Ramos asked Smith to do it.  Smith walked with his girlfriend towards Malone as Malone and his lieutenants stood on Bathgate Avenue.  Smith shot Malone seven times and injured two others, thrust the gun at his girlfriend, and ran away.  Avilez gave $800 to Ramos, who gave it to Smith.

Smith took the stand at trial.  The Government presented a brief rebuttal case.

Through its completion of a special verdict form, the jury found the defendant guilty as charged in Count One of conspiring to distribute 50 grams or more of crack cocaine, one kilogram or more of heroin, and five kilograms or more of cocaine during the period from 1998 through 2002, and of having participated in that conspiracy after September 1, 2000.  It also found the defendant guilty of murdering Malone (Count Two) and Celestine (Count Six) while engaged in a narcotics offense, but acquitted Smith of that same charge in connection with the death of Kitt (Count Four).

4

The jury was charged that in order to convict Smith of the crime charged in Count Two -- the murder of Malone -- the Government had to prove inter alia that Smith murdered Malone while engaged in the narcotics conspiracy charged in Count One and that the murder related in some meaningful way to that narcotics conspiracy.  As for Count Six, the jury was charged that the Government had to prove that while Smith was engaged in a conspiracy with Colon to distribute cocaine and crack, Smith murdered Celestine and that that murder related in some meaningful way to the narcotics conspiracy in which both Smith and Colon were engaged.

The jury found Smith guilty as well of having caused the death of all three murder victims through the use of a firearm: Malone (Count Three); Kitt (Count Five); and Celestine (Count Seven).  The jury was charged that the Government had to prove inter alia that Smith was a participant in the relevant charged drug conspiracy, and that in the course of using or carrying a firearm during and in relation to that conspiracy caused the victim's death.  The charge explained the issue of causation as follows:

> A defendant's conduct causes the death of another individual if it had such an effect in producing that individual's death as to lead a reasonable person to regard the defendant's conduct as a cause of the death.  The death of a person may have one or more than one cause.  You need not find that a defendant

shot the victim or that he committed the final, fatal
act.  The Government need only prove that the conduct
of the defendant was a substantial factor in causing
the victim's death.  Another way of putting it is,
would a reasonable person regard the defendant's
conduct as a cause of the person's death?

Finally, the jury found Smith guilty of conspiring to
distribute 50 grams or more of crack cocaine and of distributing
crack cocaine in August 2005.  Smith's petition does not
challenge his convictions on Counts Eight and Nine, which stem
from these 2005 events.


DISCUSSION

Under 28 U.S.C. § 2255, "a federal prisoner may move the
sentencing court to vacate, set aside, or correct the sentence
on the ground that such sentence was illegally imposed."
Puglisi v. United States, 586 F.3d 209, 213 (2d Cir. 2009).
Smith raises two challenges to his conviction.  He asserts that
his trial counsel provided ineffective assistance by failing to
challenge 1) the sufficiency of the evidence on seven counts and
2) the admission of Rule 404(b) evidence through the testimony
of his former girlfriend without a limiting instruction.  He
asserts that appellate counsel was also ineffective for failing
to raise these issues on appeal.

I.   Standard for Ineffective Assistance of Counsel

     The Supreme Court has established a two-part test for
evaluating claims of ineffective assistance of counsel.
Strickland v. Washington, 466 U.S. 668, 687 (1984); accord
Morales v. United States, 635 F.3d 39, 43 (2d Cir. 2011).
"First, the defendant must show that counsel's performance was
deficient.  This requires showing that counsel made errors so
serious that counsel was not functioning as the 'counsel'
guaranteed by the Sixth Amendment."  Strickland, 466 U.S. at
687.  "Second, the defendant must show that the deficient
performance prejudiced the defense."  Id.  While the defendant
must prove both deficient performance and prejudice, "there is
no reason for a court deciding an ineffective assistance claim
to approach the inquiry in the same order or even to address
both components of the inquiry if the defendant makes an
insufficient showing on one."  Id. at 697.

     Under Strickland, "[a] criminal defendant has a high burden
to overcome to prove the deficiency of his counsel."  Lynn v.
Bliden, 443 F.3d 238, 247 (2d Cir. 2006) (citation omitted).
With respect to the first prong, the court must "indulge a
strong presumption that counsel's conduct falls within the wide
range of reasonable professional assistance," as "[t]here are
countless ways to provide effective assistance in any given

7

case." Strickland, 466 U.S. at 689.  Moreover, "[a]ctions
and/or omissions taken by counsel for strategic purposes
generally do not constitute ineffective assistance of counsel."
Gibbons v. Savage, 555 F.3d 112, 122 (2d Cir. 2009).  The
performance inquiry examines the reasonableness of counsel's
performance "from counsel's perspective at the time" and
"considering all the circumstances." Strickland, 466 U.S. at
688, 689.

The petitioner's burden with respect to prejudice is
similarly stringent.  Smith must show a "reasonable probability
that, but for counsel's unprofessional errors, the result of the
proceeding would have been different." Id. at 694; accord
United States v. Caracappa, 614 F.3d 30, 46 (2d Cir. 2010). In
applying this standard, "[a] reasonable probability is a
probability sufficient to undermine confidence in the outcome."
Strickland, 466 U.S. at 694; accord Wilson v. Mazzuca, 570 F.3d
490, 507 (2d Cir. 2009). "[T]he ultimate focus of inquiry must
be on the fundamental fairness of the proceeding whose result is
being challenged." Strickland, 466 U.S. at 696.

Strickland also governs ineffective assistance of appellate
counsel claims.  Ramchair v. Conway, 601 F.3d 66, 73 (2d Cir.
2010).  Under this standard, appellate counsel have no duty to
raise every possible argument on appeal.  Jones v. Barnes, 463

U.S. 745, 751 (1983); accord Ramchair, 601 F.3d at 73.  To

prevail on a claim of ineffective assistance of appellate

counsel, a petitioner must show that "counsel omitted

significant and obvious issues while pursuing issues that were

clearly and significantly weaker."  Ramchair, 601 F.3d at 73

(citation omitted).

Ineffective assistance claims may usually be brought

through § 2255 petitions.  United States v. Brown, 623 F.3d 104,

112 (2d Cir. 2010).  Because Smith has not shown that he can

prevail on a claim that his trial counsel was ineffective, it

necessarily follows that he has not shown that his appellate

counsel's performance on the direct appeal of his conviction was

deficient.

II.  Sufficiency of Evidence at Trial

A defendant who challenges the sufficiency of the evidence

following a conviction bears a "heavy burden."  United States v.

Finley, 245 F.3d 199, 202 (2d Cir. 2001).  A court "must credit

every inference that the jury may have drawn in favor of the

government.  The jury's verdict must be sustained, if any

rational trier of fact could have found the essential elements

of the crime beyond a reasonable doubt."  Id. at 202-03

(citation omitted); see also United States v. Bass, 310 F.3d

321, 326 (5th Cir. 2002) (applying same standard in reviewing a

challenge to the sufficiency of the evidence brought in a Section 2255 petition).

Because Smith testified on his own behalf at trial, he has lost "his right to have sufficiency assessed on the basis of the government's presentation alone." United States v. Tran, 519 F.3d 98, 105 (2d Cir. 2008) (citation omitted).  Through his testimony, Smith "might inadvertently [have] add[ed] weight to the government's case." Id. at 106 (citation omitted).

Smith continues to protest that he is innocent, but for purposes of this petition concedes that there was sufficient evidence at trial to establish certain of the factual underpinnings of the crimes with which he was charged.  He does not contest, therefore, that there was sufficient evidence at trial to find that both Avilez and Colon engaged in narcotics conspiracies, that Avilez hired Smith to murder Malone, that Colon hired Smith to murder Kitt and Celestine, and that he committed the three murders.  Smith does contest, however, that there was sufficient evidence to prove other elements of the crimes charged in six of the eight counts on which he was convicted.

A.   Kitt and Celestine Murders:  Counts Five through Seven

Smith contends that there was insufficient evidence for a jury to find that Smith murdered either Kitt or Celestine "with

the knowledge of and intent to join" Colon's drug conspiracy.
As a result, he argues that there was insufficient evidence for
his conviction on Counts Five through Seven.

There was overwhelming evidence that Smith was aware of
Colon's drug operations.  There was, as well, more than
sufficient direct and circumstantial evidence from which a jury
could find that Smith understood that Colon wanted Kitt and
Celestine killed because they were interfering with Colon's drug
operations.  The jury was entitled to find, therefore, that by
committing the murders Smith intended to assist Colon's drug
business.  The evidence further showed that Smith provided such
assistance to Colon in order to obtain drugs from Colon for
Smith's own drug operation, and that Colon in fact gave Smith
drugs after the Celestine murder.

This evidence satisfies the requirement of Count Six that
the evidence establish that Smith intentionally killed Celestine
while engaged in a narcotics conspiracy with Colon.  See United
States v. Aguilar, 585 F.3d 652, 657 (2d Cir. 2009) (violating
18 U.S.C. § 248 by killing another in furtherance of a
continuing criminal enterprise); United States v. Santos, 541
F.3d 63, 72-74 (2d Cir. 2008) (participating in a drug
conspiracy by committing murder).  This also constitutes
sufficient evidence to establish that, as charged in Counts Five

and Seven, Smith participated in a narcotics conspiracy with Colon, and that Smith's use of the firearm to cause the deaths of Kitt and Celestine was in furtherance of that narcotics conspiracy.

Smith's attack on his convictions on Counts Five through Seven principally rests on his acquittal on the crime charged in Count Four -- killing Kitt while engaged in a narcotics conspiracy with Colon.  Smith concludes from the acquittal that the jury must have determined that Smith had not engaged in a drug conspiracy with Colon.  There is a far more likely explanation for the jury's verdict.  Kitt's murder was an element of both Counts Four and Five, but the elements of Counts Four and Five are different.  If the jury could not agree on whether Smith or Ramos actually shot Kitt, but it was satisfied that both Smith and Ramos worked together to cause Kitt's murder, then their differing verdicts on the two counts are easily explained.

The eyewitness testimony from the woman sitting near Kitt on Chisholm Street identified Ramos (the "Spanish" guy) instead of Smith (the gunman's black companion) as the man who actually shot Kitt.  The charge for Count Four required the jury to find that Smith "intentionally killed" Kitt.  In contrast, the charge for Count Five required the jury to find that Smith used or

12

carried a firearm (in furtherance of the narcotics conspiracy with Colon) and in the course of doing so used the firearm to "cause" Kitt's death.  The jury was also instructed, as described above, that it need not find that Smith shot Kitt so long as a reasonable person would regard Smith's conduct as a cause of Kitt's death.

In sum, the acquittal on Count Four does not lead ineluctably to the conclusion that there was insufficient evidence to find that Smith engaged in the drug conspiracy with Colon charged in the Indictment.  Indeed, the jury was repeatedly charged that to convict Smith on each of Counts Four through Seven that it had to find that Smith engaged or participated in the charged Colon drug conspiracy.  The more obvious explanation is that the jury was uncertain whether Smith actually shot Kitt.  As summarized above, there is sufficient evidence to support each of the elements of the crimes charged in Counts Five through Seven.  In any event, inconsistent verdicts are not a ground for reversal.  United States v. Acosta, 17 F.3d 538, 545 (2d Cir. 1994).

B.   Malone's Murder:  Counts One through Three

Smith contends that there was insufficient evidence that he ever became a member of Avilez's drug conspiracy or that Malone's murder was committed in furtherance of that drug

conspiracy.  Smith admits that both Malone and Avilez operated
drug organizations and that there were confrontations between
Malone and Avilez, but explains that the confrontations were
prompted by a series of misunderstandings and not by any rivalry
between the two drug organizations.  According to Smith, since
there was no drug rivalry between the two men, Smith's agreement
to assist Avilez by killing Malone cannot constitute evidence of
Smith's agreement to help Avilez's drug enterprise.  Smith
emphasizes that there was no evidence that he ever learned the
reason Avilez wanted Malone killed.  Based on this argument,
Smith seeks to vacate his convictions on Counts One through
Three.  Counts Two and Three both incorporated the drug
conspiracy charged in Count One.

The evidence at trial established that Malone and Avilez
each ran street level drug organizations that controlled
territory about three blocks apart in the Bronx.  Their
organizations were among a small number of drug organizations
that competed within the same neighborhood for customers.  In
addition, Malone had a reputation for violence and was feared by
many.  Malone had also demonstrated his dislike and even
contempt for Avilez in several ways.  Among other acts of
aggression against Avilez, Malone used an apartment within
Avilez's territory as a stash house, pistol-whipped Avilez's

manager in full view of members of both drug organizations, and chased Avilez off Malone's territory by tailgating Avilez's car. Ramos, who acted as an enforcer for Avilez, warned Avilez that he would have to kill Malone "before he killed any of us."

Based on this and other testimony at trial, there was more than sufficient evidence for a jury to find that Avilez wanted to kill Malone at least in part to protect his own drug organization.  There was also abundant evidence that Smith understood that this was Avilez's purpose and that Smith murdered Malone to further that purpose.  Avilez had described his problems with Malone directly to Smith, including the incident in which Malone tailgated Avilez to drive him out of Malone's territory.  When Malone attended a wake in a funeral home for an Avilez associate in February 14 and acted disrespectfully, Avilez decided that he would ask Smith to murder Malone.  Ramos delivered the request and Smith murdered Malone as he stood across the street from the funeral home.

In support of his petition, Smith relies on United States v. Desinor, 525 F.3d 193 (2d Cir. 2008).  In Desinor, the Court of Appeals reviewed, inter alia, a sufficiency-of-the-evidence challenge to a conviction on the charge that the defendant had engaged in a narcotics conspiracy that resulted in murder, in violation of 18 U.S.C. § 848(e)(1)(A).  While some evidence

15

pointed to the murder as a culmination of a personal feud, other evidence showed that the murder was related to an ongoing drug rivalry.  Id. at 203.  Noting that the defendant bore a "heavy burden," id. (citation omitted), the court held that a "rational juror could have found that at least one reason" for the murder was related to the drug distribution conspiracy.  Id. (emphasis supplied).  For these same reasons, evidence of personal animosity between Avilez and Malone is insufficient to invalidate Smith's conviction.  There was abundant evidence of the competition between the two leaders and their organizations over drug territory and that that competition provided at least one motive for Avilez to seek Malone's murder.

Finally, in his reply, Smith speculates that the jury may have used the evidence of his drug activity as charged in Counts Eight and Nine or as described by his former girlfriend to convict him on the crimes charged in Counts One through Seven. Smith's argument is premised on his contention that there was no evidence to suggest that he joined either the Colon or Avilez drug conspiracies prior to committing the murders for Colon and Avilez.  From this he concludes that the jury must have based its findings regarding the amount of drugs distributed in the conspiracy charged in Count One on evidence of Smith's own drug dealing.  Smith adds, however, that there was insufficient

evidence that he personally distributed the quantities of drugs the jury specifically found were distributed when it rendered its verdict on Count One.  Smith's argument reflects several misunderstandings.

First, there was ample evidence at trial to establish that both the Colon and Avilez drug conspiracies distributed the quantities of each of the drugs that the jury's verdict found were distributed, and Smith does not suggest otherwise.  Smith's act of committing a murder in furtherance of the drug conspiracies was sufficient to establish his knowing and intentional participation in those conspiracies and to render him liable for the quantities of drugs distributed by others through those conspiracies.  While some may participate in a conspiracy by obtaining, packaging, transporting, protecting or selling the drugs and, of course, by managing the entire operation, another may do so by acting as an enforcer.  Together, each participant's work furthers the goal of the conspiracy.

Second, Smith's emphasis on the dates of the murders suggests a belief that he cannot be held responsible for narcotics distributed through the conspiracy before he joined it.  But, "a defendant need not have joined a conspiracy at its inception in order to incur liability for the unlawful acts of

17

the conspiracy committed both before and after he or she became a member." Santos, 541 F.3d at 73 (citation omitted).

Four of the counts on which Smith was convicted included jury findings regarding a drug quantity identified in the Indictment:  Counts One, Two, Six and Eight.  In this regard, the jury was charged, inter alia, that in order to convict the defendant the Government had to prove beyond a reasonable doubt

(1)   that it was an object of the conspiracy [the jury was considering] to distribute or to possess with the intent to distribute [the identified] quantity of a controlled substance;

(2)   that the defendant knew or should have known that that was an object of the conspiracy, or that it was reasonably foreseeable to the defendant that that was an object of the conspiracy; and

(3)   that the defendant intentionally and knowingly became a member of that conspiracy.

The evidence entitled the jury to find, as it was instructed it must to convict the defendant, that he knew at the time he joined the conspiracies that both the Colon and Avilez conspiracies were distributing the quantities of different narcotics found by the jury.

Finally, Smith's concern that the jury may have used the evidence underlying his conviction on Counts Eight and Nine to convict him of the crimes charged in the remaining counts of the Indictment is misplaced.  Counts Eight and Nine charged Smith with narcotics offenses in August 2005 and were based on a completely separate set of witnesses and exhibits from the other

18

charges.   The remaining counts addressed events and conspiracies that concluded no later than 2002.

In conclusion, Smith has not shown either that his attorney should have objected at trial to the sufficiency of the evidence underlying his conviction on Counts One through Seven, or that he was prejudiced by the absence of such an objection.   His first claim of ineffective assistance therefore fails.

III. Other Crimes Evidence

Smith argues that the evidence of his drug dealings that was offered at trial through the testimony of his former girlfriend was Rule 404(b) evidence and not evidence of any of the drug crimes charged in the Indictment.   He argues further that his trial counsel should have objected to the admission of this Rule 404(b) evidence and that this failure allowed the evidence to be received without the Court conducting the requisite balancing test under Rule 403 and without the jury being given a limiting instruction when the evidence was introduced.

The Second Circuit "follows the 'inclusionary' approach to 'other crimes, wrongs, or acts' evidence, under which such evidence is admissible unless it is introduced for the sole purpose of showing the defendant's bad character, or unless it is overly prejudicial under Fed. R. Evid. 403 or not relevant

under Fed. R. Evid. 402." <u>United States v. Carlton</u>, 534 F.3d
97, 101 (2d Cir. 2008) (citation omitted).  A district court
properly admits such evidence under Rule 404(b) of the Federal
Rules of Evidence when "(1) the prior acts evidence was offered
for a proper purpose; (2) the evidence was relevant to a
disputed issue; (3) the probative value of the prior act
evidence substantially outweighed the danger of its unfair
prejudice; and (4) the court administered an appropriate
limiting instruction." <u>United States v. Brand</u>, 467 F.3d 179,
196 (2d Cir. 2006) (citation omitted).  Evidence that is
"inextricably linked with the evidence offered to prove the
charged offense . . . is admissible without reference to Rule
404(b)." <u>United States v. Quinones</u>, 511 F.3d 289, 309 (2d Cir.
2007).  Similarly, "relevant background evidence" is admissible
and "outside the ambit of Rule 404(b)." <u>United States v.
Romero-Padilla</u>, 583 F.3d 126, 130 (2d Cir. 2009).

Smith's former girlfriend testified at trial that beginning
in 1996 she transported crack for Smith over the course of
several years to Albany, New York and Winchester, Virginia.  On
a few occasions after 1996 she obtained crack from Smith and
resold it in the Bronx.  The evidence regarding Smith's drug
activities provided by his former girlfriend at trial was
properly admitted as evidence regarding the defendant's

20

participation in the crimes charged in the Indictment and to
explain his relationship to this key Government witness.  The
evidence was inextricably intertwined with the evidence of all
three murders and the associated drug conspiracies and provided
background to understand Smith's motives in committing the
charged crimes and his relationship to a witness who assisted
him in connection with two of the murders.

Smith's former girlfriend principally provided testimony
about two of the murders.  She saw Smith after he killed
Celestine; helped him destroy clothing that he had worn at the
time of the murder; and discussed the murder with him.  Smith
used her as a decoy when he shot and killed Malone.  It was
Valentine's Day, and Smith asked his girlfriend to accompany him
as he walked down the block toward Malone.  Then, after Smith
finished firing his weapon, he thrust the gun into her jacket
and ran.  Smith left the young woman on her own to find her way
out of the area.  Shortly thereafter, she met Smith and returned
the gun to him.

As noted, besides giving testimony about the two murders,
the witness also described Smith's drug business.  She
accompanied him on trips to distribute drugs outside New York
City, including one or more trips on which Smith sold drugs he
had received from Colon for killing Kitt and Celestine.  This

and other evidence of Smith's drug activities related directly to his payments for the two murders and his motive in committing murders for men who ran drug organizations.

In sum, it is doubtful that any of the testimony that Smith's former girlfriend gave at trial about her drug activities with Smith constituted Rule 404(b) testimony.  But, even if some of that evidence may be characterized as Rule 404(b) evidence, Smith has not show that he was prejudiced by its receipt into evidence.  He has not shown that it was not relevant to proof of the crimes with which he was charged, that an explicit balancing of the factors in Rule 403 would have led to its exclusion, or that he was prejudiced by the absence of a limiting instruction.  Indeed, Smith's reply brief in support of his petition abandons any argument regarding this prong of his petition.

Finally, even if it is assumed that all of the evidence of Smith's drug transactions with his former girlfriend is Rule 404(b) evidence, Smith has not shown that his counsel was ineffective for failing to object to the admission of the evidence without a limiting instruction.  Smith's trial counsel was a talented defense attorney, who actively participated in the debate of the many motions in limine presented by the defendant and by the Government.  Defense counsel won a number

22

of significant evidentiary rulings, including rulings that
excluded from the trial record any evidence of Smith's
commission of other, uncharged murders.  Since the defendant was
charged in the Indictment with two drug conspiracies and three
murders, it was entirely understandable and within the scope of
competent representation to allow evidence of the defendant's
drug activities with one trial witness to be received without
further highlighting that evidence with a limiting instruction.
There is a strong presumption that counsel's discretion in
"atten[ding] to certain issues to the exclusion of others
reflects trial tactics rather than sheer neglect," Harrington v.
Richter, 131 S. Ct. 770, 790 (2011), and that "counsel's conduct
falls within the wide range of reasonable professional
assistance," as "[t]here are countless ways to provide effective
assistance in any given case."  Strickland, 466 U.S. at 689.
Thus, Smith can show neither prejudice nor ineffective
assistance from his counsel's failure to object to this
witness's testimony about his own sales of drugs.


CONCLUSION

     Smith's petition for a writ of habeas corpus is denied.  In
addition, the Court declines to issue a certificate of
appealability.  Smith has not made a substantial showing of a

denial of a federal right, and appellate review is therefore not warranted. Love v. McCray, 413 F.3d 192, 195 (2d Cir. 2005). The Court also finds pursuant to 28 U.S.C. § 1915(a)(3) that any appeal from this Order would not be taken in good faith. Coppedge v. United States, 369 U.S. 438, 445 (1962).  The Clerk of Court shall dismiss this petition and close the case.

     SO ORDERED:

Dated:    New York, New York
          June 6, 2011

                              _____
                                DENISE COTE
                 United States District Judge